**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| ISAAC JAKOBOVITS, as Trustee of the LITE TRUST I, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 1:15-cv-9977 |
| v. | ) ) | |
| ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA, | ) ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. iii

I.      INTRODUCTION .................................................................................................. 1

II.     STATEMENT OF FACTS ..................................................................................... 2

    A.   The Policy Terms: The Death Benefit Protection Rider, the Guaranteed Death
        Benefit Test, and the Three-Month Premium Requirement ......................................... 2

    B.   Allianz's Premium Overcharges ............................................................................... 4

    C.   Allianz Wanted to Force the Policies to Lapse .......................................................... 5

        1.   Allianz's Scheme to Force the Oberlander Policies to Lapse ............................. 5

        2.   Allianz's Efforts to Force the Stern and Rosenberg Policies to Lapse............... 8

    D.   Assignment of All Rights, Title, and Interest in the Policies to LITE Trust I........... 10

III.    Legal Standard ................................................................................................... 11

    A.   Summary Judgment ............................................................................................ 11

    B.   Insurance Policy Contract Disputes & New York's *Contra Proferentem* Rule. ....... 11

IV.    Argument ............................................................................................................ 12

    A.   Allianz Materially Breached Its Contractual Obligations. ....................................... 12

        1.   Allianz Breached Each Policy's Three-Months Provision and DBP
            Rider. ......................................................................................................... 13

        2.   In the Alternative, Allianz Breached the Policies by Intentionally Issuing
            Inflated Premium Demands. ........................................................................ 15

    B.   The Policyholder Was Damaged by Allianz's Breaches, and Plaintiff Holds
        All Rights, Title, and Interests Related to the Policies. ............................................. 19

    C.   Allianz's STOLI Defenses Are Barred by (i) New York's Two-Year
        Incontestability Rule, (ii) the *Kramer* Decision, (iii) Allianz's Failure to
        Return Premiums Paid, and (iv) Waiver. .................................................................. 20

    D.   The Policyholders Performed Their Duties Under the Policies. ................................. 22

V.      CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*AEI Life, LLC v. Lincoln Benefit Life Co.*,
　　No. 14-CV-6449 JBW, 2016 WL 7408835 (E.D.N.Y. Dec. 22, 2016) ........................... 21

*Am. Gen. Life Ins. Co. v. Salamon*,
　　483 F. App'x 609 (2d Cir. 2012) .................................................................... 22

*Baiardi v. Standard Fire Ins. Co.*,
　　No. 13-CV-5912 SJF, 2013 WL 6157231 (E.D.N.Y. Nov. 21, 2013) ........................... 22

*Dalton v. Educ. Testing Serv.*,
　　87 N.Y.2d 384 (1995) .................................................................................. 17

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*,
　　411 F.3d 384 (2d Cir. 2005) .......................................................................... 12

*Fixed Income Shares: £Series M v. Citibank N.A.*,
　　130 F. Supp. 3d 842 (S.D.N.Y. 2015) ............................................................... 23

*Gabriel v. Jackson Nat. Life Ins. Co.*,
　　No. 11-CV-12307 MLW, 2015 WL 1410406 (D. Mass. Mar. 26, 2015) ....................... 15

*Ganelina v. Pub. Adm'r, New York Cty.*,
　　963 N.Y.S.2d 545 (Sup. Ct. 2013) ................................................................... 21

*Greenwich Vill. Assocs. v. Salle*,
　　493 N.Y.S.2d 461 (1985) .............................................................................. 18

*Grigsby v. Russell*,
　　222 U.S. 149 (1911) .................................................................................... 19

*Havel v. Kelsey-Hayes Co.*,
　　445 N.Y.S.2d 333 (1981) .............................................................................. 18

*Hosp. Auth. of Rockdale Cty. v. GS Capital Partners V Fund, L.P.*,
　　No. 09-CV-8716 PAC, 2011 WL 182066 (S.D.N.Y. Jan. 20, 2011) ............................ 18

*IBM Credit Fin. Corp. v. Mazda Motor Mfg. (USA) Corp.*,
　　92 N.Y.2d 989 (1998) .................................................................................. 24

*In re Preston's Will*,
　　29 N.Y.2d 364 (1972) .................................................................................. 23

*John Wiley & Sons, Inc. v. Book Dog Books, LLC*,
　　No. 13-CV-816 WHP, 2016 WL 1216583 (S.D.N.Y. Mar. 25, 2016) ........................... 11

iii

*Johnson v. Metro. Life Ins. Co.*,
  913 N.Y.S.2d 44 (2010) ................................................................ 21

*Kramer v. Phoenix Life Ins. Co.*,
  15 N.Y.3d 539 (2010) ............................................... 10, 19, 21, 22

*Lebovits v. PHL Variable Ins. Co.*,
  No. 12-CV-6397 FB, 2016 WL 4194120 (E.D.N.Y. Aug. 9, 2016)............. 14, 15, 19, 20

*Lothrop v. Allstate Life Ins. Co.*,
  310 N.Y.S.2d 631 (Sup. Ct. 1970) ................................................ 23

*New England Mut. Life Ins. Co. v Caruso*,
  73 N.Y.2d 74 (1989) .................................................................... 21

*New York Life Ins. Co. v. Viglas*,
  297 U.S. 672 (1936) .................................................................... 20

*NIACC, LLC v. Greenwich Ins. Co.*,
  857 N.Y.S.2d 723 (2008) ............................................................. 12

*Oscar Gruss & Son, Inc. v. Hollander*,
  337 F.3d 186 (2d Cir. 2003) ........................................................ 20

*Reliastar Life Ins. Co. of New York v. Leopold*,
  745 N.Y.S.2d 810 (Sup. Ct. 2002) ................................................ 21

*Royal Park Invs. SA/NV v. HSBC Bank USA, Nat. Ass'n*,
  109 F. Supp. 3d 587 (S.D.N.Y. 2015) ............................................ 18

*Sabre v. First Dominion Capital, LLC*,
  No. 01-CV2145 BSJ HBP, 2001 WL 1590544 (S.D.N.Y. Dec. 12, 2001) ............ 17

*Safeway Envtl. Corp. v. Am. Safety Ins. Co.*,
  No. 08-CV-6977 WHP, 2010 WL 331693 (S.D.N.Y. Jan. 28, 2010) .............. 11, 12

*Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc.*,
  522 N.Y.S.2d 292 (1987) ............................................................. 24

*U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*,
  112 F. Supp. 3d 122 (S.D.N.Y. 2015) ............................................ 21

*US Bank Nat. Ass'n v. PHL Variable Ins. Co.*,
  288 F.R.D. 282 (S.D.N.Y. 2012) ................................................... 22

*Vargas v. Ins. Co. of N. Am.*,
  651 F.2d 838 (2d Cir. 1981) ................................................... 12, 17

*Wald v. Marine Midland Bus. Loans, Inc.*,
    704 N.Y.S.2d 564 (2000) ........................................................................ 11, 20

*Weiss v. Lincoln Nat'l Life Ins. Co.*,
    No. 14-CV-4944 ERK, 2016 WL 4991533 (E.D.N.Y. Sept. 15, 2016) .............. 15, 23, 24

*White Lines Com LLC v. Winnington Networks, Ltd.*,
    No. 13-CV-3059 PGG, 2015 WL 7288640 (S.D.N.Y. Nov. 17, 2015) ........................... 20

*Zeligfeld v. Phoenix Life Ins. Co.*,
    975 N.Y.S.2d 370, 2013 WL 1688902 (Sup. Ct. 2013) ............................................. 19, 24

**STATUTES**

N.Y. Ins. Law § 3203 ...................................................................................... 15, 21

**RULES**

Fed. R. Civ. P. 56 .............................................................................................. 11

**OTHER AUTHORITIES**

69 N.Y. Jur. 2d Ins. § 1470 ................................................................................. 21

## I.    __INTRODUCTION__

Beginning in 2009, Defendant Allianz Life Insurance Company of North America ("Allianz") embarked on a business decision to breach the terms and force the lapse of nine life insurance policies insuring the lives of three insureds: Messrs. Oberlander, Stern, and Rosenberg. Collectively, these policies provided $84,169,131 in death benefits—coverage for which Allianz had received $5,797,253.84 in premiums. To force those policies to lapse, Allianz <u>demanded</u> <u>**$946,858 *more*** in premiums than was required</u> under the contracts to keep the policies in force— calculations Allianz's own expert described as "reliable and accurate."

As such, Allianz's breach is indisputable. The policies contain identical provisions entitling the policyholder to keep each policy from lapsing by making "[a] premium payment sufficient to keep th[e] policy in force for three months." The premiums Allianz demanded wildly exceeded this three-month contractual requirement. The math is irrefutable: the excessive amounts Allianz demanded for the Oberlander policies would have kept them in force for 17 months, and the amounts Allianz demanded for the other policies would have kept each in force for 5 months. Nevertheless, <u>Allianz repeatedly told the policyholder it could not pay a penny less than the inflated amounts Allianz demanded</u>. *E.g.*, Pl.'s SMF ¶ 50; *e.g.*, *id.* ¶¶ 69, 71 (telling the policyholder "the absolute minimum" it could pay was the amount listed in the grace notice).[1]

Nothing more is needed to show Allianz's breach and entitle Plaintiff to summary judgment. Yet, substantially more exists. Discovery confirmed that, for the three Oberlander policies, an Allianz employee named Lindsey Webber manipulated the automated grace notices

---

[1] References in this brief to "Pl.'s SMF" refer to paragraphs in Plaintiff's Rule 56.1 Statement of Material Facts. References to "Ex." or "Exhibit" refer to the exhibits identified in the attached declarations of Andres Healy and Isaac Jakobovits. All emphasis in any quotations to evidence has been added unless specifically noted as "emphasis in original."

generated by Allianz's computer system—punitively increasing the computer-generated "[a]mount due" by 584%. For the remaining policies, Allianz pre-programmed its computers to demand inflated payments. Thus, as Allianz admitted, it had never "seen a policy or set of policies with this many errors in them"—each to the "detriment of the policyholder." *Id*. ¶ 87.

Discovery also confirmed the reason Allianz went to such lengths: Allianz wanted to force the policies to lapse to erase the $84 million in coverage without refunding the millions in premiums already received. Thus, as Allianz's Rule 30(b)(6) representative testified, it was "in Allianz's interest to have the policy lapse" because "[w]e don't refund a premium on a lapsed policy." Ex. 46 at 109:10-110:13. In fact, immediately after approving the final Oberlander grace notices with the 584% premium overcharge, Ms. Webber told another Allianz employee: "**Looks good to me :) I hope these lapse**." *Id*. ¶ 90. He responded: "**I hope they lapse too**." *Id*.

Accordingly, the Court should grant summary judgment to Plaintiff on his breach of contract and declaratory judgment claims.

## II.     STATEMENT OF FACTS

### A.     The Policy Terms: The Death Benefit Protection Rider, the Guaranteed Death Benefit Test, and the Three-Month Premium Requirement

This case concerns nine Flexible Premium Adjustable Life Insurance Policies purchased from Allianz in 2007 and 2008—policies for which Allianz accepted $5,797,253.84 in premiums before illegally lapsing each in late 2009 and 2010. Pl.'s SMF ¶¶ 1-13.

Each of these Generation Planner II Life Insurance Policies are, for the most part, identical. *Id*. ¶¶ 32-50. None required premiums to be paid on a set schedule. *Id*. ¶ 33. Instead, each stated that "[f]lexible premium may be paid until the death of the Insured." *Id*. Given this flexibility, the policies required Allianz to use three tests to calculate when an additional premium payment was owed and the amount of that payment. *Id*. ¶¶ 34-35. This lawsuit

addresses Allianz's violation of the Guaranteed Death Benefit Test ("GDB Test") set forth in each policy's Death Benefit Protection Rider II ("DBP Rider"), which, according to Allianz's regulatory filings, provided policyholders "[G]uarantee[d] [coverage] to age 120 regardless of [the policy's] cash value" as long as "the guaranteed death benefit test is met."[2] *Id.* ¶ 36.

The DBP Rider modifies the base policy requirements and prevents a policy from entering "grace"—a pre-condition to Allianz's ability to lapse a policy for non-payment—if the GDB Test is met. *Id.* ¶¶ 37, 42, 44-45. If a policy enters grace, the DBP Rider also entitles a policyholder to keep it from lapsing by paying a premium sufficient to satisfy the GDB Test for three months. *Id.* ¶¶ 40, 46-48; *see also id.* ¶ 35 (Grace Period provision) (stating that, if a policy enters grace, "[a] premium payment sufficient to keep this policy in force for three months is required and must be received prior to the last day of the Grace Period or this policy will Lapse"); *id.* ¶¶ 36-50 (describing operation of the DBP Rider). This provision will be referred to in this memorandum as the "Three-Months Provision"

Given the DBP Rider, Allianz's Rule 30(b)(6) witness on the topic of "[t]he operation and purpose of the Generation Planner II Life Insurance Policy" confirmed that, if a policy goes into grace, a policyholder never needs to pay more than the amount needed to satisfy the GDB Test for three months to keep it from lapsing:

> Q Okay. So that means that, as long as you have paid enough money to satisfy the guaranteed death benefit test in a particular month, your policy is guaranteed not to lapse until this age 94?
> A That is correct.
> Q And, similarly, if a policy goes into grace, as long as you pay the

---

[2] The other two tests provided for in the policies are the "Net Cash Value" test and the "Policy Protection Test." Pl.'s SMF ¶ 34. It is undisputed that a policy had to fail <u>all three tests</u> before it would enter grace. *Id.* ¶¶ 44-46; Ex. 45 (Allianz 30(b)(6) (Petit) Tr.) at 46:18-22 ("Q So, in other words, you have to fail the net cash value test, the death benefit protection rider test and the policy protection test before the system would treat the policy as in a grace period? A Yes.").

> amount required to satisfy the death benefit protection rider for the three
> months, again, <u>your policy is *guaranteed* not to lapse</u>?
> A <u>That is correct</u>.

*Id.* ¶ 48 (quoting Ex. 46 (Allianz 30(b)(6) (Anderson) Tr.) at 55:5-15); *id.* ¶¶ 46-48 (confirming a policy must "fail the net cash value test, the death benefit protection rider test and the policy protection test before the system would treat the policy as in a grace period" and, if that occurs, policyholder has to pay only "the amount required to satisfy one of those three calculation amounts, the cheapest calculation amount, for three months").

## B.    <u>Allianz's Premium Overcharges</u>

Allianz breached its contractual obligation under the Three-Months Provision that allows a policyholder to prevent a lapse by paying "the amount required to satisfy the death benefit protection rider for the three months." *E.g.*, *id.* ¶¶ 35, 46-49, 65-66, 69-77, 96, 101, 115. Allianz admits that it always "demanded" a premium payment "<u>greater</u> than the amount that would have satisfied [each policy's] Death Benefit Protection Rider for three months." *Id.* ¶ 52 (Ex. 51 (Responses to Requests 3, 11-12, 16) (admitting "the payment amount [Allianz] demanded to keep each [] Policy from lapsing after it entered grace … was greater than the amount that would have satisfied its Death Benefit Protection Rider for three months")).

As calculated by Plaintiff's expert economist, Robert Mills, the amounts Allianz demanded the policyholder pay to prevent a lapse were a total of **<u>$946,858.14 *more* than what the policies required</u>**. *Id*. ¶ 53. These inflated amounts, which are summarized in the below table, would have kept the Oberlander policies in force for <u>17 months</u> and the Stern and Rosenberg policies in force for <u>5 months</u>—far longer than the <u>3 months</u> the policies required:

4

| Insured | Policy No. | Due Per Notice | Due Under DBP Rider | Overcharge (Dollars) | Overcharge (Percent) |
|---|---|---|---|---|---|
| Sandor Oberlander | 60028222 | $ 275,155 | $ 40,214 | $ 234,941 | 584% |
| Sandor Oberlander | 60028329 | 275,155 | 40,214 | 234,941 | 584% |
| Sandor Oberlander | 60028330 | 275,155 | 40,214 | 234,941 | 584% |
| Herman Stern | 60027211 | 83,390 | 47,822 | 35,567 | 74% |
| Herman Stern | 60027213 | 79,583 | 45,639 | 33,944 | 74% |
| David Rosenberg | 60027741 | 97,760 | 54,629 | 43,131 | 79% |
| David Rosenberg | 60027749 | 97,760 | 54,629 | 43,131 | 79% |
| David Rosenberg | 60027750 | 97,760 | 54,629 | 43,131 | 79% |
| David Rosenberg | 60027751 | 97,760 | 54,629 | 43,131 | 79% |

*Id.* ¶¶ 53, 57-59. Allianz's expert in this case, Jeffrey C. Harper, does not dispute these calculations; instead, he described Mr. Mills' work as "well researched and detailed" and, "for the most part, … reliable and accurate" and relied on Mr. Mills' calculations. *Id.* ¶¶ 54-59.

**C.**   **Allianz Wanted to Force the Policies to Lapse**

Allianz's contractual breaches and extreme mathematical blunders were no accident. They were intentional—part a calculated campaign to force the policies to lapse. *Id.* ¶¶ 88-90, 93-95, 102-103; *e.g.*, *id.* ¶ 94 (admitting "that, in fact, Allianz wanted these policies to lapse"); *id.* ¶ 102 (confirming that, "in addition to wanting the O[b]erlander policies to lapse," Jason Janoski (a senior Allianz representative) had said "they want[ed] the Stern policies to lapse").

1.   Allianz's Scheme to Force the Oberlander Policies to Lapse

Allianz's chicanery to force the Oberlander policies to lapse is extensive. In fact, discovery in this case forced Allianz to confirm it had "[n]ever seen a policy or set of policies with this many errors in them"—every single one to the "detriment of the policyholder." *Id.* ¶ 87.

Months before the Oberlander policies entered grace, Allianz zeroed-in on them—placing them on a "watch list" on which it identified each policy as "[s]oon to lapse." *Id.* ¶ 61. Then, it had a senior Allianz policy administration representative named Lindsey Webber bypass

5

Allianz's computer systems, ignore the GDB Test, and manually create wildly inaccurate grace notices that told the policyholder it had to pay $275,155 per policy to prevent a lapse, even though Allianz knew those figures were "wrong." *Id.* ¶¶ 60-66, 68, 74, 77.

Allianz then doubled-down on its 584% premium overcharge and repeatedly told the policyholder that $275,155 per policy was the "minimum" amount it could pay to keep the Oberlander policies from lapsing. *Id.* ¶¶ 65-77. Even after Allianz's computer systems later auto-generated grace notices demanding $71,569.28 per policy (also inflated) to prevent a lapse, Allianz stopped those notices from being sent, manually "edited" them to demand $275,155 per policy, and sent only the modified versions to the policyholder. *Id.* ¶¶ 67-68.

When the policyholder called Allianz to confirm there was no lesser amount it could pay to keep the policies from lapsing, Allianz continued to lie—telling the policyholder $275,155 per policy was "the absolute minimum that he could send" and that Allianz would not accept anything less to keep the policies in force. *Id.* ¶¶ 69-76 (confirming Allianz told the policyholder in multiple phone calls that took place in May and June of 2010 the minimum it could pay was $275,155 per policy); Ex. 46 (Allianz 30(b)(6) (Anderson) Tr. Vol II) at 41:8-22 (confirming that "at no point" during "the phone calls that occurred between the policyholders and Allianz" did Allianz "provide the policyholder with the actual minimum premium amount that was due").

During a May 11, 2010 call, for example, the Oberlander policyholder asked Allianz "what's the minimum amount necessary to be paid to take the policy out of grace." Pl.'s SMF ¶ 70. Despite knowing its $275,155 per policy demand was incorrect, Allianz told the policyholder it had to pay that amount. *Id.* ¶¶ 65, 70. Later that day, Allianz re-confirmed its position—telling the policyholder the Oberlander policies would lapse if the policyholder did not "send in that full amount." *Id.* ¶¶ 71-72. Allianz repeated its position again the next day—

responding to the policyholder's request for "what exactly is due on [each] Oberlander policy" by telling the policyholder the minimum amount it could pay was $275,155 per policy. *Id.* ¶ 73. And in yet another call, Allianz refused the policyholder's June 3, 2010 offer to pay a lesser amount and told it "the minimum they would need to pay on this [Oberlander] policy to get it out of grace" was $275,155 per policy—and not a penny less. *Id.* ¶ 76.

In audio recording after audio recording produced by Allianz in this case, Allianz employees also are caught red-handed discussing the fact that Allianz wanted the Oberlander policies to lapse and the steps they should take to make sure that happened:

- In one, Allianz discusses internally how, even though the policyholder's "[grace notice] bill didn't produce correctly," Allianz was not going to fix the issue because, while "the [grace notice] bill didn't get generated" on time, "our stance, Allianz's stance is that, that's a benefit to the clients." *Id.* ¶¶ 79-81.

- In another, Allianz explains how it is "sick of these policies" and frustrated that it had gotten "so close" to lapsing them, but now would have to wait to do so because Allianz had not provided the grace period notice the policies required— telling an employee it "needs to be more on the ball because, if it was, it would have been so close to lapsing" these policies. *Id.* ¶¶ 82-84.

- In another recording, Allianz admits that the Oberlander policies are being watched and that, once they lapse, Allianz plans to "put the brakes on and do other things" to make sure they do not get reinstated. *Id.* ¶ 76.

- And in yet another recording, Allianz explains how it "hate[s]" the Oberlander policies, which it describes as "big deals," and how Allianz's employees should "give the[ policyholders] the least amount of information possible" as a result— "[n]ot to be mean, but just to cover ourselves." *Id.* ¶ 85.

In an email sent just one week before Allianz lapsed each Oberlander policy, Ms. Webber revealed why Allianz breached the contracts. *Id.* ¶¶ 7, 90. Immediately after approving the last and final grace notices with the 584% premium overcharge, Ms. Webber told another Allianz employee: "**Looks good to me :) I hope these lapse**." *Id.* ¶ 90. He responded: "**I hope they**

**lapse too**." *Id.*[3]

Faced with this mountain of undisputed evidence of malfeasance, Allianz's corporate representative offered only one explanation for its many breaches of its policy obligations: "that, in fact, Allianz wanted these policies to lapse." *Id.* ¶¶ 88-89, 94.

2.    Allianz's Efforts to Force the Stern and Rosenberg Policies to Lapse.

Like the Oberlander policies, the Stern and Rosenberg policies were listed on Allianz's "lapse target list." *Id.* ¶¶ 93, 95. Also like the Oberlander policies, Allianz demanded the policyholder pay more than actually was required to keep the Stern and Rosenberg policies from lapsing—$242,036.16 more than was due (a 74% overcharge on the Stern policies and a 79% overcharge on the Rosenberg policies). *Id.* ¶¶ 52-54.

Unlike the Oberlander grace notices, however, Ms. Webber did not manually manipulate the Stern and Rosenberg grace notices. *Id.* ¶¶ 96-97. Instead, those notices were inaccurately generated by Allianz's computers, which Allianz had pre-programmed to inflate the amounts demanded by requiring <u>four</u> months' worth of premiums rather than the <u>three</u> months the policies required under the Three-Months Provision. *Id.* ¶¶ 35, 97-100; Ex. 42 (Mills Report) at 21 ¶ 30, 25 ¶ 38 (explaining that Allianz's computation "requires a payment sufficient to cover three additional monthly deductions under the DBP Rider after the grace notice is generated (i.e., at least four months in total)."). As Allianz's corporate representative explained:

> Q So Allianz is actually requiring the policyholder to pay four months['] worth of premium.
> A Well, it wouldn't -- It could possibly be that, but it -- it would be essentially the amount due owed plus three months.

---

[3] After the Oberlander policies lapsed, Allianz breached the contractual language again by refusing to allow them to be reinstated. Pl.'s SUF ¶¶ 93-94. Allianz also told the policyholder "that the [Oberlander] policies could not, in fact, be reinstated" because "we don't like policies to be going in and out of grace constantly. It's a ton of work." *Id.* ¶¶ 92-93.

> Q … So, for example, again, the Oberlander policies go into grace April 13, 2010. <u>You're saying that Mr. Oberlander, or the policyholder at the time, would have had to pay the April payment, the May payment, the June payment and the July payment</u>?
> A <u>In this case, **yes**</u>.

Pl.'s SMF ¶ 100. Allianz's also pre-programmed its computer systems to bake-in other mathematical errors that resulted in additional premium overcharges. *Id.* ¶¶ 96-99 (explaining Allianz also deviated from the policy formula by wrongly programming its computer systems to always (1) include a 15% penalty in its calculations, (2) not credit interest on the initial monthly anniversary, and (3) vary the Monthly Guaranteed Death Benefit Factor applied each month).

Together, these deviations from the policy formulas resulted in the inflated premium demands Allianz sent—amounts that would have kept the policies in force for <u>five</u> months, not the <u>three</u> months the policies required. *Id.* ¶¶ 52-54, 58-59, 96-100 (calculating that the amounts Allianz demanded would have kept each policy in force for five months). And even though Allianz knew that its computers were pre-programmed to inflate the premium amounts demanded, Allianz never told the policyholder it could pay less to keep the policies in force. *Id.* ¶¶ 99-101, 115. Instead, Allianz confirmed that—despite its improper programming—Allianz treated the "[a]mounts due" listed in its grace notices as the minimum "amount that they [policyholders] need to pay in order to keep the policy from lapsing." *Id.* ¶¶ 50, 101, 115.

Allianz also took other steps to force the Stern and Rosenberg policies to lapse. *Id.* ¶¶ 102-114, 116-118. Allianz refused to provide requested illustrations. *Id.* ¶¶ 104, 116. Allianz failed to provide the required 30-days of grace period notice—backdating the notices it later sent to try to hide its breach. *Id.* ¶¶ 107-111. Allianz told employees not to give the policyholder minimum payment information—explaining Allianz "want[s]" the Stern policies "to lapse, because there's no way we'll reinstate these if they lapse." *Id.* ¶¶ 102-103.

Allianz also lied to the policyholder on recorded telephone calls. On January 29, 2010, the policyholder called Allianz to confirm what amount it needed to pay—telling Allianz "we don't wanna lapse any" of the policies. *Id.* ¶¶ 108-111. Claiming it did not know how much was owed, Allianz nevertheless told the policyholder on that recoded call not to worry because, if the policies lapsed, Allianz would permit them to be automatically reinstated. *Id.* ¶¶ 110-111. That was a lie. After Allianz lapsed the policies, it refused to permit them to be automatically reinstated—telling the policyholder it needed to go through full underwriting and pay Allianz the inflated grace notice amounts plus an additional $1,265,243.17. *Id.* ¶¶ 112-113. That, too, turned out to be a lie. Allianz already had pre-determined it would never reinstate the policies—telling its employees the same day it lapsed the Stern policies "not to allow reinstatement on the[]" Oberlander, Stern, or Rosenberg policies. *Id.* ¶¶ 93, 114, 118.

### D.    Assignment of All Rights, Title, and Interest in the Policies to LITE Trust I

Each of the policies at issue was owned by GSCF Loan Trust ("GSCF") when Allianz lapsed them. *Id.* ¶¶ 3, 7, 12, 16-19, 25-29. And because the policies were freely assignable, *Kramer v. Phoenix Life Ins. Co.*, 15 N.Y.3d 539, 551 (2010); Pl.'s SMF ¶ 15 ("The Oberlander, Stern, and Rosenberg policies each state: 'You may assign or transfer all or specific ownership rights of this policy.'"), GSCF subsequently assigned its rights, title, and interest in the policies to JMA Investors, LLC ("JMA"), which then assigned those rights, title, and interest to LITE Trust I ("LITE") in March 2013. Pl.'s SMF ¶¶ 20-21, 30-31.[4] Plaintiff thus brings this case as the

---

[4] On April 2, 2015, LITE sold the Oberlander policies to Oberlander Policy Holdings, LLC, for a period of 30 days with an automatic reversion to LITE thereafter. Pl.'s SMF ¶ 21. Oberlander Policy Holdings, LLC, nevertheless filed suit against Allianz in New York state court on June 9, 2015. *Id.* Allianz moved to dismiss the complaint on the grounds that Oberlander Policy Holdings, LLC was not the owner or beneficiary of the policies. *Id.* That suit was dismissed by stipulation of the parties and without prejudice on December 7, 2015. *Id.* ¶ 22.

current owner of each of the policies and any rights or interests the prior policyholders had in them or related to them. *Id.* ¶ 14; *Wald v. Marine Midland Bus. Loans, Inc.*, 704 N.Y.S.2d 564, 565 (2000) (holding that "assignee stands in the shoes of the assignor" and can bring any claims assignor could have brought directly).

## III.   LEGAL STANDARD

### A.   Summary Judgment

As this Court has explained, "[s]ummary judgment is appropriate '[i]f the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Safeway Envtl. Corp. v. Am. Safety Ins. Co.*, No. 08-CV-6977 WHP, 2010 WL 331693, at *2 (S.D.N.Y. Jan. 28, 2010) (Pauley, J.) (quoting Fed. R. Civ. P. 56(c)). "The burden of demonstrating the absence of any genuine dispute rests with the moving party." *Id.* Thus, "[i]n determining whether there is a genuine issue as to any material fact, '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor.'" *Id.* (citation omitted).

### B.   Insurance Policy Contract Disputes & New York's *Contra Proferentem* Rule.

Under New York law, which the parties agree governs in this case, Ex. 84 at 3 (Response to Request 22), the "four elements of a breach of contract claim are: (1) the existence of a valid contract, (2) plaintiff's performance of the contract, (3) defendant's material breach of the contract, and (4) resulting damages." *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, No. 13-CV-816 WHP, 2016 WL 1216583, at *2 (S.D.N.Y. Mar. 25, 2016) (Pauley, J.).

In resolving disagreements about insurance policy terms, "the initial interpretation of a contract 'is a matter of law for the court to decide.'" *Safeway Envtl. Corp.*, 2010 WL 331693, at *3 (citation omitted). "The insurer bears a heavy burden of proof, for it must establish that the words and expressions used [in the insurance policy] not only are susceptible of the construction

sought by [the insurer] but that it is the only construction which may fairly be placed on them." *Vargas v. Ins. Co. of N. Am.*, 651 F.2d 838, 840 (2d Cir. 1981) (alteration in original) (citation and internal quotation marks omitted). Thus, the "insurer is obliged to show (1) that it would be unreasonable for the average man reading the policy to [construe it as the insured does] and (2) that its own construction was the only one that fairly could be placed on the policy." *Id.* (same).

If the insurer can meet its burden to show "only one reasonable interpretation exists, the words are given effect as written." *Safeway Envtl.*, 2010 WL 331693, at *3. However, "'where the terms of an insurance contract could suggest <u>more than one meaning</u> when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business,'" an ambiguity exists, *id.* (emphasis in original) (citation omitted), and New York law requires that ambiguity to "be construed against the insurer, *NIACC, LLC v. Greenwich Ins. Co.*, 857 N.Y.S.2d 723, 724 (2008); *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 390 (2d Cir. 2005) (explaining that a "policy must . . . be construed in favor of the insured, and ambiguities, if any, are to be resolved in the insured's favor and against the insurer." (alteration in original).

Thus, a New York court interpreting an insurance policy must answer a "narrow" question: "is the insurer's interpretation of the contract the only reasonable and fair construction as a matter of law?" *Vargas*, 651 F.2d at 840. "If not, the contract must be construed against the insurer" as a matter of law. *Id.* (applying rule to construe policy against insurer).

## IV.   ARGUMENT

### A.   Allianz Materially Breached Its Contractual Obligations.

Allianz materially breached its contractual policy obligations in at least two ways—either of which warrant granting summary judgment in favor of the Plaintiff. First, Allianz breached the

Three-Months Provision by lapsing the policies after refusing to allow the policyholder to pay "[a] premium payment sufficient to keep [each] policy in force for three months." *E.g.*, Pl.'s SMF ¶¶ 35, 50, 53-59, 65-66, 69, 96, 101, 107, 115. Second, Allianz issued grace notices that wildly overstated the premium "[a]mount due." *E.g.*, *id.* ¶¶ 35, 50, 54, 65-66, 96, 101, 107, 115.

    1.   <u>Allianz Breached Each Policy's Three-Months Provision and DBP Rider.</u>

The Three-Months Provision of each policy states that, if it enters grace, "[a] premium payment sufficient to keep th[e] policy in force for **three months** is required and must be received prior to the last day of the Grace Period or th[e] policy will Lapse." *E.g.*, *id.* ¶ 35. Further, each policy's DBP Rider requires Allianz to permit a policyholder to satisfy the Three-Months Provision by paying an amount sufficient to satisfy the GDB Test for three months. *Id.* ¶¶ 35, 37, 44-48. A policyholder is, in fact, <u>guaranteed</u> that the policy will not lapse if a payment is made sufficient to satisfy the GBT Test for three months. *Id.* ¶ 46 (Ex. 46 (Allianz 30(b)(6) (Anderson) Tr.) at 55:5-15 ("Q And, similarly, <u>if a policy goes into grace, as long as you pay the</u> <u>amount required to satisfy the death benefit protection rider for the three months, again</u>, **your** **policy is _guaranteed_ not to lapse**? A **That is correct**.").[5]

A guarantee is a guarantee. Allianz, however, unquestionably breached these policy requirements—<u>admitting</u> the minimum amount it "demanded to keep each [] Policy from lapsing after it entered grace … was greater than the amount that would have satisfied its Death Benefit Protection Rider for three months." *Id.* ¶¶ 52-57. For the Oberlander policies, for example, Allianz never demanded less than $275,155 per policy (enough to fund each for <u>17 months</u>) even

---

[5] As Allianz's own internal Business Requirements document states, ███████████
███████████████████████████████████████████████. Ex. 44 at -427; Ex. 45 (Allianz 30(b)(6) (Petit) Tr.) at 46:18-22 (confirming "it's the <u>cheapest</u> of the three amounts that the system calculates that's actually required to take the policy out of grace").

though only $40,214 was due—a $234,941 per policy overcharge. *Id*. ¶¶ 54, 57, 65.

Allianz also refused to allow the Oberlander policyholder to pay less than this 17 month figure to keep a policy from lapsing—a clear breach of the Three-Months Provision. *Id*. ¶ 3; *id.* ¶¶ 64-66 (admitting Allianz knew this amount was "wrong" before it ever sent it to the policyholder); *id.* ¶¶ 69-77 (telling the Oberlander policyholder the "absolute minimum" Allianz would accept to keep the policies in force was $275,155 per policy and that, if the policyholder did not "send in that full amount" for a policy, "[t]hen it will lapse").

Allianz breached the Stern and Rosenberg policies in a similar way—demanding the policyholder pay five months of premiums and telling the policyholder that, if payment of that inflated amount "does not reach us by the due date, your policy will lapse." *Id*. ¶¶ 35, 96, 101, 115. Those demands were substantially higher than the policies permitted. *Id*. ¶ 54 (calculating that Allianz demanded 74% more than was due for Stern policies and 79% more than was due for Rosenberg policies); *id.* ¶¶ 55-57 (explaining minimum amounts Allianz demanded would have kept policies in force two months longer than Three-Month Provision authorized).

In total, Allianz demanded the policyholder pay $946,858 more than it actually owed to keep the policies from lapsing. *Id*. ¶¶ 53-54. Nothing more is needed to prove *Allianz's material breaches and enti*tle Plaintiff to summary judgment. In far less egregious circumstances than at issue here, the court in *Lebovits v. PHL Variable Ins. Co.* entered summary judgment against the insurer for demanding four months of premiums when only three months' worth of premiums were required. --- F. Supp. 3d ----, No. 12-CV-6397 FB, 2016 WL 4194120, at *2 (E.D.N.Y. Aug. 9, 2016) (granting summary judgment against insurer that demanded policyholder pay, "in effect, a fourth monthly premium (or portion thereof)" to keep a policy from lapsing); Ex. 82 (*Lebovits* Motion) at 8 (explaining that insurer had demanded $72,078.72 when, at most,

$53,772.69 was due ("a difference of almost $20,000, or thirty-five (35) percent").[6] Other courts have reached similar results. *See Gabriel v. Jackson Nat. Life Ins. Co.*, No. 11-CV-12307 MLW, 2015 WL 1410406, at *4 (D. Mass. Mar. 26, 2015) (holding that insurer breached the policy "by demanding payment of an amount that was $8110.61 higher than the amount required by the policy to continue coverage"); *cf. Weiss v. Lincoln Nat'l Life Ins. Co.*, No. 14-CV-4944 ERK, 2016 WL 4991533, at *5 (E.D.N.Y. Sept. 15, 2016) (denying insurer's motion for judgment on the pleadings where it demanded "over two thousand dollars" more than was required to keep policy in force for three months).

  2. <u>In the Alternative, Allianz Breached the Policies by Intentionally Issuing Inflated Premium Demands.</u>

Allianz's Rule 30(b)(6) witness on the topic of "[t]he operation and purpose of the Generation Planner II Life Insurance Policy" unequivocally confirmed that the policy's "grace period provision requires Allianz to tell the policyholder the amount required to keep the policy from lapsing" and that this amount must be the "<u>minimum</u> amount" needed to keep it from lapsing. Ex. 46 (Allianz 30(b)(6) (Anderson) Tr.) at 15:15-22; *e.g.*, *id.* at 16:14-19 (agreeing each policy "requires that Allianz, 30 days prior to lapse, inform the policyholder of the minimum amount necessary to keep the policy from lapsing"); Pl.'s SMF ¶¶ 49-50.

After all, the purpose of such grace notices is to tell the policyholder that, unless that specified premium amount is paid, the policy will lapse. Ex. 45 (Allianz 30(b)(6) (Petit) Tr.) 122:10-24 (explaining the purpose of Allianz's grace notices "is to inform the client that their

---

[6] The *Lebovits* plaintiff brought a claim for, *inter alia*, breach of contract based on that policy's incorporation of § 3203 of the New York Insurance Law, but subsequently refused to make the catch-up premium payments in the amount that the parties agreed upon and that the Court found to be required. As a result, the Court subsequently dismissed the case with prejudice. Ex. 79 (Dismissal Order). That decision is on appeal. Ex. 80 (Notice of Appeal).

coverage is about to expire, unless they take action," and thus tell the policyholder "[t]he amount that they need to pay in order to keep the policy from lapsing"); Pl.'s SMF ¶¶ 49-50; *see* Ex. 49 (Allianz's Harper Report) at 13 n.48 ("Allianz illustrates the minimum of the three tests in its grace notices."); Ex. 47 (Rouse Report) at 1 ("Where a policy permits different options to maintain a policy in-force, as THE POLICIES [at issue in this litigation] do, the industry custom, practice, and market expectation is for the insurance company to include on a grace notice the cheapest Grace Payment amount that the policyholder could pay."); Ex. 48 (Rouse Tr.) at 104:22-105:25 (explaining Allianz demonstrated its intent to adhere to the industry custom and practice by describing the amount required to take a policy out of grace in the portion of the policy that "talk[s] about sending written notification to [the policyholder's] address advising the grace period has [be]gun" and by including an "[a]mount due" in each grace notice it sent).

In its recent briefing to this Court, however, Allianz disavowed its Rule 30(6) witness's testimony and changed its position—contending that the policies "require[] no more than that notice of the grace period be given, with no requirement that Allianz include any premium amount in the[m]." Dkt. 32 at 2. Accordingly, Allianz believes that it is free to demand any amount it wants in a grace notice so long as that amount is <u>higher</u> than what actually is due:

> Q So it's Allianz's position that the grace notice can state an amount more than what is actually required to keep the policy in force in its grace notices, in accordance with its contract?
> A Yes.
>
> \*          \*          \*
>
> Q So if Allianz just issued all of its grace period notices stating an amount due of a million dollars, even though $10,000 was due, that would satisfy its obligations under its policies to its policyholders?
> A No. Requiring a premium of a million dollars would likely violate IRS limits, and that would not be a prudent thing to tell policyholders.
> Q **At what point does it stop becoming prudent to overstate the amount actually due Allianz**?
> A **I don't know**.

Ex. 45 (Allianz 30(b)(6) (Petit) Tr.) at 123:19-25, 128:5-129:5 (objections omitted).

That is not a reasonable construction of the policy, and it is certainly not the "only reasonable and fair construction," which is what Allianz is required to prove. *Vargas*, 651 F.2d at 840. Regardless, Mr. Petit's bizarre testimony does nothing to undermine the binding Rule 30(b)(6) testimony of Mr. Anderson—the Allianz Rule 30(b)(6) witness actually designated to discuss Allianz's understanding of its policy requirements—who testified that the policy's "grace period provision requires Allianz" to state in a grace notice "the <u>minimum</u> amount [due] to keep the policy from lapsing." Ex. 46 (Allianz 30(b)(6) (Anderson) Tr.) at 15:15-22, 16:14-19; Pl.'s SMF ¶ 54; *see also Sabre v. First Dominion Capital, LLC*, No. 01-CV2145 BSJ HBP, 2001 WL 1590544, at *1 (S.D.N.Y. Dec. 12, 2001) ("A 30(b)(6) witness testifies as a representative of the entity, his answers bind the entity and he is responsible for providing all the relevant information known or reasonably available to the entity."). As such, the most Allianz can show is that <u>its own witnesses</u> cannot agree on what the policy requires, which would also entitle Plaintiff to summary judgment under the well-known legal rule requiring any ambiguities in an insurance contract to be "construed 'most favorably to the insured and most strictly against the insurer.'" *Vargas*, 651 F.2d at 839-40 (citation omitted).

Even if the policy somehow only could be reasonably construed in favor of Allianz to mean that the policy is silent as to what premium amount Allianz must include in a grace notice, that does not give Allianz *carte blanche* to demand the policyholder pay any exorbitant amount. At a minimum, Allianz's "Premium Lies Are Permitted" position violates the implied covenant of good faith and fair dealing New York law reads into every contract—particularly given that Allianz's overcharges here ranged from 74% to 584%. Pl.'s SMF ¶ 54. *See, e.g.*, *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) ("Implicit in all contracts is a covenant of good faith

and fair dealing in the course of contract performance" that precludes each party from doing "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."); *Greenwich Vill. Assocs. v. Salle*, 493 N.Y.S.2d 461, 464 (1985) ("[I]n every contract there is an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part.").

"Under New York law '[t]he implied covenant of good faith and fair dealing requires a promisor to reasonably facilitate occurrence of a condition precedent by either refraining from conduct which would prevent or hinder the occurrence of the condition, or by taking positive action to cause its occurrence.'" *Royal Park Invs. SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 605 (S.D.N.Y. 2015) (citation omitted). As such, a breach exists if, while a party's actions do not violate a "contract's express terms," they subverted their purpose—"depriving [the other party] of his reasonable expectations." *Hosp. Auth. of Rockdale Cty. v. GS Capital Partners V Fund, L.P.*, No. 09-CV-8716 PAC, 2011 WL 182066, at *4 (S.D.N.Y. Jan. 20, 2011) (finding claim existed where party's "conduct 'was done ... in bad faith'" (citation omitted)). This is because every contract "include[s] any promises which a reasonable person in the position of the promisee would be justified in understanding [to be] included"—even if not expressly stated. *Havel v. Kelsey-Hayes Co.*, 445 N.Y.S.2d 333, 335 (1981) (citation omitted).

This case demonstrates exactly why New York law incorporates this "implied obligation by each party to deal fairly with the other and to eschew actions which would deprive the other party of the fruits of the agreement" into "every contract." *Greenwich*, 493 N.Y.S.2d at 464. By deliberately inflating the amounts it told the policyholder were due to keep each policy from lapsing, Allianz intentionally, purposefully, and successfully subverted the purpose of the policy

provisions that <u>guaranteed</u> that the policy would not lapse if the policyholder paid an amount "sufficient to keep the policy in force for three months" under the <u>Guaranteed</u> Death Benefit Test—depriving the policyholder of the fruits of the contract itself. *See* Pl.'s SMF ¶¶ 35-50; *cf. Zeligfeld v. Phoenix Life Ins. Co.*, 975 N.Y.S.2d 370, 2013 WL 1688902, at *4 (Sup. Ct. 2013) (noting concern that inflated "notice runs the danger of deterring a person who could make the actual payment required, but could not make the erroneous higher amount listed, from making the payment necessary to prevent a lapse"). Indeed, the evidence is undisputed that Allianz made these higher demands because, "in fact, Allianz wanted these policies to lapse"—the opposite of good faith and fair dealing. Pl.'s SMF ¶ 94; *see id.* ¶¶ 88-90, 102-103.

**B.     The Policyholder Was Damaged by Allianz's Breaches, and Plaintiff Holds All Rights, Title, and Interests Related to the Policies.**

Allianz's breaches of its policy obligations unquestionably caused damages, including the loss of $84,169,131 in death benefit coverage and the $5,797,253.84 in premium payments already paid. *E.g.*, *id.* ¶¶ 1-8, 10-13; *Lebovits*, 2016 WL 4194120, at *3 (*g*ranting summary judgment to policyholder after policyholder failed to pay insurer's inflated demands); *see Zeligfeld*, 2013 WL 1688902, at *3 (explaining inflated premium demands "runs the danger of deterring a person … from making the payment necessary to prevent a lapse"); Ex. 60 (Allianz 30(b)(6) Tr. (Anderson) Vol II) at 23:6-13 (agreeing that providing policyholder with incorrect information "could cause or contribute to the policy lapsing").

Life insurance policies, and rights and interests in such policies, are freely assignable under New York law. *Kramer*, 15 N.Y.3d at 551 ("New York law permits a person to procure an insurance policy on his or her own life and immediately transfer it to one without an insurable interest in that life, even where the policy was obtained for just such a purpose."); *see also Grigsby v. Russell,* 222 U.S. 149, 155-56 (1911) ("[L]ife insurance has become in our days one

of the best recognized forms of investment and self-compelled saving. So far as reasonable safety permits, it is desirable to give to life policies the ordinary characteristics of property."); Pl.'s SMF ¶ 16 ("The Oberlander, Stern, and Rosenberg policies each state: "You may assign or transfer all or specific ownership rights of this policy."). Thus, because Plaintiff is the current owner of all rights, title, and interest related to the policies at issue, *id.* ¶¶ 14-31, it "stands in the shoes of the [original] assignor" and can bring any policy claims the policyholder could have brought directly. *Wald*, 704 N.Y.S.2d at 565.

Plaintiff therefore is entitled to the relief he seeks: payment of the $30 million death benefit, along with prejudgment interest, for Allianz's breach of the Oberlander policies, Pl.'s SMF ¶ 9 (confirming Mr. Oberlander died on December 4, 2014), and an order declaring the lapse of the remaining policies invalid and that Allianz must treat each as being in full force and effect. "Under New York law, damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003); *White Lines Com LLC v. Winnington Networks, Ltd.*, No. 13-CV-3059 PGG, 2015 WL 7288640, *2 (S.D.N.Y. Nov. 17, 2015) (explaining that the "correct" damages standard is the 'amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract'" (citation omitted). *As Lebovits demonstrates, Plaintiff* also is entitled to reinstatement of the unmatured policies. 2016 WL 4194120, at *3; *New York Life Ins. Co. v. Viglas*, 297 U.S. 672, 678 (1936) (holding that, under New York law, the proper remedy for an insurer's breach includes "a judgment effective to reinstate his policy").

**C.    Allianz's STOLI Defenses Are Barred by (i) New York's Two-Year Incontestability Rule, (ii) the *Kramer* Decision, (iii) Allianz's Failure to Return Premiums Paid, and (iv) Waiver.**

Plaintiff's predecessors in interest obtained the policies in late 2007 and early 2008, and,

prior to improperly lapsing each policy in late 2009 and 2010, Allianz never challenged their validity. Pl.'s SMF ¶¶ 1, 4-5, 8, 10, 13, 121. Now, however, Allianz is trying to escape the consequences of its illegal actions by arguing the policies are "void *ab initio* because they are stranger originated life insurance ("STOLI"), … and due to misrepresentations in the application process for the issuance of the Policies and due to the Policies being intentionally procured for resale in a secondary market rather than for a lawful purpose." Answer, Dkt. 14 at 11 (Eleventh and Twelfth Defenses). These defenses are barred as a matter of law for four different reasons.

First, New York bars any challenge to the validity of a life insurance policy after it has been in force for two years, and here Allianz did not challenge the policies in the two years after it issued them in late 2009 and early 2010. *See* N.Y. Ins. Law § 3203[a][3]; *New England Mut. Life Ins. Co. v Caruso*, 73 N.Y.2d 74, 77 (1989) ("[P]assage of the [two-year] incontestability period bars the insurer from thereafter asserting the policyholder's lack of an insurable interest"). As a result, Allianz cannot challenge the validity of the policies on any ground. *Ganelina v. Pub. Adm'r, New York Cty.*, 963 N.Y.S.2d 545, 548 (Sup. Ct. 2013) ("An incontestability clause renders void any defense that the life insurance policy was invalid at its inception.").[7]

Second, STOLI policies were legal in New York when the policies issued. *Kramer*, 15 N.Y.3d at 553; *U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 139

---

[7] Even "fraudulent misrepresentations, fraud in the procurement, and <u>fraud in the making of the contract have been held barred as defenses after the expiration of the period of contestability.</u>" *AEI Life, LLC v. Lincoln Benefit Life Co.*, --- F. Supp. 3d ----, No. 14-CV-6449 JBW, 2016 WL 7408835, at *6 (E.D.N.Y. Dec. 22, 2016) (emphasis in original) (quoting 69 N.Y. Jur. 2d Ins. § 1470); *e.g.*, *Johnson v. Metro. Life Ins. Co.*, 913 N.Y.S.2d 44, 46 (2010) ("New York's incontestability statute bars challenges even when the insured has failed to disclose facts on an insurance application" or made an "alleged misrepresentation concerning insured's assets and the purpose for the insurance."); *Reliastar Life Ins. Co. of New York v. Leopold*, 745 N.Y.S.2d 810, 812 (Sup. Ct. 2002) ("It is well settled that once the incontestable period has elapsed, allegations that an insured procured the policy through fraud will not support a claim to void or rescind the policy." (citing authorities)).

(S.D.N.Y. 2015) ("[I]n its wisdom, the New York Court of Appeals has declared that STOLI transactions are legal in New York."). "New York law permits a person to procure an insurance policy on his or her own life and immediately transfer it to one without an insurable interest in that life, even where the policy was obtained for just such a purpose." *Kramer*, 15 N.Y.3d at 553.

Third, Allianz failed to take the proper steps to assert its defenses—including filing a counterclaim to rescind the policies and interpleading the $5,797,253.84 in premiums (plus interest) it collected on those policies. *US Bank Nat. Ass'n v. PHL Variable Ins. Co.*, 288 F.R.D. 282, 286 (S.D.N.Y. 2012) (holding that an insurer "must seek a declaratory judgment" and "tender the premiums paid to the court" before it can assert a STOLI defense); *Am. Gen. Life Ins. Co. v. Salamon*, 483 F. App'x 609, 611-12 (2d Cir. 2012) (holding that New York law requires an insurer who rescinds a policy to refund all premiums received).

Fourth, Allianz waived its STOLI defense long ago. By June 2009, it had categorized each policy as "STOLI." Pl.'s SMF ¶¶ 119-120. Nevertheless, Allianz decided it "want[ed] the policies to stay active and continue to have the monthly/annual premium come in as scheduled" and thereafter continued to accept premiums on each of the policies for months, *id.* ¶ 121—a fact that now precludes any attempt to rescind them. *Am. Gen. Life Ins.*, 483 F. App'x at 612 (noting "'well settled' rule of New York insurance law that 'the continued acceptance of premiums by the carrier after learning of facts which allow for the rescission of the policy, constitutes a waiver of, or more properly an estoppel against, the right to rescind'" (citation omitted)).

### D.    The Policyholders Performed Their Duties Under the Policies.

The policyholders performed their duties under the policy—paying Allianz millions of dollars to obtain their policies and sustain them as long as they did. Pl.'s SMF ¶¶ 1, 4-5, 8, 10, 13 (identifying payments). *Cf. Baiardi v. Standard Fire Ins. Co.*, No. 13-CV-5912 SJF, 2013 WL 6157231, at *2 (E.D.N.Y. Nov. 21, 2013) (finding each plaintiff "performed his or her own

obligations under his or her respective insurance policy" by, "e.g., [having] paid the premiums"). Nevertheless, Allianz contends it should be able to <u>profit</u> from its breaches because Plaintiff did not pay the wildly exaggerated premium payments Allianz demanded. This argument is illogical. "[C]ourts do not favor forfeitures and will not permit an insurer to interpose such defense where forfeiture was brought about by the conduct of the insurer." *Lothrop v. Allstate Life Ins. Co*., 310 N.Y.S.2d 631, 634 (Sup. Ct. 1970).

As such, an insurance company cannot rely on "a default in which its own negligence or wrongful act contributed, and but for which a lapse might not have occurred," to avoid a claim. *In re Preston's Will*, 29 N.Y.2d 364, 371 (1972). To the contrary, it is black-letter New York law that a party cannot avoid liability when its own failure to give proper notice caused the other's party action (or inaction)—a principle that "holds true even if [the defendant] was not contractually required to give notice" because, even if a defendant had no "contractual duty to give notice, it certainly had the power to do so, and it 'has been established for over a century that a party may not insist upon performance of a condition precedent when its non-performance has been caused by the party itself.'" *Fixed Income Shares: £Series M v. Citibank N.A.*, 130 F. Supp. 3d 842, 855 (S.D.N.Y. 2015) (noting rule that a party "'is not permitted to take advantage of its own wrong'" (citation omitted)). This principle squarely applies here.

In *In re Preston's Will*, for example, the New York Court of Appeals awarded full benefits for the insurer's contractual breach despite the fact that the policyholder did not subsequently tender any payments—explaining:

> [W]e find unconvincing the rationale, and the circular argument, that would excuse [the insurance company] because no premiums were forthcoming, following its wrongful attempt to rescind; when, indeed, the supposed rescission may well have been the cause of the nonpayment.

29 N.Y.2d at 371. Similarly, the court in *Weiss v. Lincoln Nat'l Life Ins. Co.* rejected the

insurer's argument that the plaintiff's claims were precluded by the fact that the policyholder had not tendered any payment after it received the insurer's inaccurate grace notice demands—which overstated the actual amount due by just $2,544.77 (or 22%). 2016 WL 4991533, at *4 (citing *Zeligfeld*, 2013 WL 1688902, at *4).[8] The court held instead that, because the insurer's premium demand overstatement was not *de minimis*, it excused the policyholder's subsequent non-payment. *Id.* (concluding that the $14,067.57 the insurer demanded was "significantly higher" than the $11,523.00 actually due). The same result is even more appropriate here where Allianz overstated the premiums due by more than $946,858 (overcharges of 74%, 79%, and 584% for the Stern, Rosenberg, and Oberlander policies, respectively). *See Zeligfeld*, 2013 WL 1688902, at *4 (denying insurer's motion to dismiss contract claim because, if "the premium amount listed as due in the notice is significantly higher than the amount actually required, the notice runs the danger of deterring a person … from making the payment necessary to prevent a lapse.").

Finally, the policyholder's subsequent performance also was excused under ordinary repudiation principles after Allianz made its inflated premium demands and refused to accept anything less to prevent a lapse. *See Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc.*, 522 N.Y.S.2d 292, 293 (1987) ("A party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition."); *IBM Credit Fin. Corp. v. Mazda Motor Mfg. (USA) Corp.*, 92 N.Y.2d 989, 993 (1998) (holding that "insistence on an untenable interpretation of a key contractual provision," coupled with a "refusal to perform otherwise," and excuses further performance).

---

[8] In *Weiss*, the insurer demanded $14,067.57 in a grace notice to prevent a lapse. The plaintiff alleged that $11,523 "would have been sufficient to keep the Policy in force for three months." 2015 WL 4991533, at *5. The difference between those two figures is $2,544.57 ( = $14,067.57 - $11,523), or a 22% premium overcharge (= $2,544.57 / $11,523).

There is a mountain of undisputed evidence—including on recorded telephone calls—that the policyholder wanted to make the additional payments required to keep the policies from lapsing. *E.g.*, Pl.'s SMF ¶¶ 69-76 (calling Allianz repeatedly to ask what they needed to pay to keep the policies from lapsing); *id.* ¶ 111 (telling Allianz "we don't wanna lapse any" of the policies). Allianz, however, refused to allow the policyholders to make those payments—telling the policyholder that Allianz would not accept anything less than its inflated demands to keep each policy from lapsing. *E.g.*, *id.* ¶¶ 69-76; *id.* ¶ 50; Ex. 45 (Allianz 30(b)(6) (Petit) Tr.) 122:21-24 (confirming Allianz considered "the amount stated on the face of the grace notice" to be the "amount that the[ policyholder] need to pay in order to keep the policy from lapsing").

Given these undisputed facts, Allianz repudiated the policies as a matter of law and thereby excused the policyholder's obligation under the Three-Months Provision to make the "premium payment sufficient to keep [a] policy in force for three months" that was actually due, but that Allianz made clear it would not accept to prevent a lapse.

## V.   **CONCLUSION**

For the foregoing reasons, Plaintiff respectively asks this Court to grant this motion for summary judgment and issue a judgment requiring Allianz (1) to pay Plaintiff the death benefits owed on the policies that have matured (so far, $30 million for the Oberlander policies) with statutory prejudgment interest on those benefits wrongly withheld and (2) to declare the lapse of the remaining policies invalid and treat each as being in full force and effect.


Dated: February 28, 2017

Respectfully submitted,

*/s/ Andres C. Healy*
Steven G. Sklaver
Admitted *Pro Hac Vice*

SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Phone: (310) 789-3100
Fax: (310) 789-3150
ssklaver@susmangodfrey.com

Andres Healy
Admitted *Pro Hac Vice*
SUSMAN GODFREY L.L.P.
1201 Third Ave, Suite 3800
Seattle, Washington 98101
Phone: (206) 505-3843
Faxe: (206) 516-3883
ahealy@susmangodfrey.com

Seth Ard
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Phone: (212) 336-8330
Fax: (212) 336-8340
sard@susmangodfrey.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 28th day of February, 2017, this document was properly served on all counsel of record via electronic filing in accordance with the S.D.N.Y. Procedures for Electronic Filing.

*/s/ Andres Healy*
Andres Healy
